## PEIRCE et al. v. NEW YORK DOCK CO.

(Circuit Court of Appeals, Second Circuit.   March 11, 1920.)

No. 110.

1. **Equity** ⊙⟶24, 348—**Forfeiture must be established by strict proof.**
   Forfeitures are not favored in equity, and the burden rests on a party claiming a forfeiture to establish it by full, clear, and strict proof.

2. **Appeal and error** ⊙⟶1011 (1)—**Finding of fact on conflicting evidence, supported by credible testimony, conclusive.**
   A finding by the trial court, on conflicting evidence, but supported by credible testimony, that high explosive mines were on board vessels moored by complainant lessee at defendant's pier, *held* conclusive on the appellate court.

3. **Wharves** ⊙⟶9—**Construction of lease of pier; "premises."**
   In a provision of a lease of a pier that lessee should not land nor store on said premises any dynamite or high explosive, "said premises," construed in connection with other provisions, *held* to mean the pier, and not to include the waters of the adjacent slip.
   [Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Premises.]

4. **Landlord and tenant** ⊙⟶37—**Lease construed most strongly against lessor.**
   A lease is to be construed most strongly against lessor and if there is doubt and uncertainty as to the meaning of a provision it is to be construed in favor of lessee.

5. **Wharves** ⊙⟶9—**Breach of lease of pier by violation of explosives ordinance.**
   Lessees of a pier in New York Harbor, under a lease requiring them to observe all rules and regulations prescribed by government or municipality, *held* to have violated its terms and forfeited their rights thereunder by permitting explosives to remain for more than 48 hours on board vessels lying at· the pier and also by violation of a War Department regulation for loading of explosives.

6. **Equity** ⊙⟶24—**Wharves** ⊙⟶9—**Will relieve from forfeiture only when compensation can be decreed.**
   Equity will not relieve against a forfeiture arising from breach of covenant, where there cannot be just compensation decreed for the breach, and this rule applies to breach of a covenant in a lease of a pier by violation of an ordinance prohibiting vessels with explosives on board ·to ' remain at piers.

7. **Injunction** ⊙⟶199—**Value of use and occupation under wrongful injunction recoverable on counterclaim.**
   Where complainants, lessees of a pier, on notice by lessor of forfeiture of the lease for breach of covenant, brought suit to restrain such forfeiture and were kept in possession by a temporary injunction, *held* on final hearing to have been wrongfully issued, the court properly awarded ·defendant on a counterclaim a money judgment for the value of the use and occupation of the pier while so held by complainants.

8. **Equity** ⊙⟶39 (1)—**Will retain jurisdiction to determine whole case.**
   When a court of equity acquires jurisdiction for any purpose, it will as a general rule proceed to determine the whole cause, though in so doing it decides questions which, standing alone, would furnish no basis of equitable jurisdiction.

Appeal from the District Court of the United States for the East-
.ern District of New York.

⊙⟶For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

Suit by William Peirce and George Peirce, trading as Peirce Bros., against the New York Dock Company. Decree for defendant, and complainants appeal. Affirmed.

The plaintiffs herein at the time the suit was brought were subjects of the kingdom of Italy and residents of Naples, in that kingdom. They were co-partners engaged in business as owners, charterers, agents, consignees, and managers of steamships and other vessels, and as such operated a number of vessels between Italy and the port of New York. After the suit was begun, and before trial, one of the plaintiffs, William Peirce, died, and the action was continued by the sole surviving partner, George Peirce, without objection by defendant. The defendant is a corporation organized under the laws of the state of New York. It is engaged in business in the Eastern District of New York as the owner of docks and warehouses.

Butler, Wyckoff & Campbell, of New York City (Homer L. Loomis, of New York City, and J. Alvin Grace, of New York City, of counsel), for appellants.

Davis, Auerbach & Cornell, of New York City (Charles E. Hotchkiss and Martin A. Schenck, both of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge (after stating the facts as above). It appears that on March 27, 1913, the plaintiffs, through their agents, entered into a written contract with the defendant, leasing from it for a period of six years, ending on April 1, 1919, certain premises known as Columbia Pier No. 22, with its appurtenances, situated on the southerly side of South Ferry, in the borough of Brooklyn, in the city of New York. On January 23, 1918, the defendant sent its agents upon the pier for the purpose of resuming possession thereof and of ousting the plaintiffs therefrom. The defendant attempted and threatened to remove the plaintiffs' agents, employés, and representatives from the pier, as well as the plaintiffs' property. The attempt was made simultaneously with the service upon the plaintiffs of a notice declaring the lease forfeited for default:

"In that you have failed to abide by, perform, and carry out certain rules, regulations, or orders issued by the city of New York, embraced within the Code of Ordinances of the City of New York, relating to explosives, and particularly the provisions of section 65 of article IV of chapter 10 of said Code, and have, among other things, retained for more than 48 hours on board of a ship lying at Columbia Pier No. 22, with its appurtenances, explosives or explosive material in excess of the amount required for said ship's own use for signaling or life-saving purposes."

The plaintiffs thereupon, and on the same day, without surrendering possession of the pier, commenced this suit, and as an incident thereof sought an injunction pendente lite. The complaint alleged that no violation of the lease had taken place and no forfeiture had been incurred; that if, contrary to their understanding, there did exist a ground for forfeiture, it was one from which a court of equity should relieve them; and that, unless the relief prayed for was granted, they would suffer immediate and irreparable damages. On the presentation of this complaint and an affidavit filed therewith the court

granted an ex parte order restraining the defendant from interfering with the plaintiffs' possession and enjoyment of the premises under the lease, pending the hearing of the application for an injunction pendente lite. That hearing was had on January 30, 1918, and an opinion was handed down on May 14, 1918, holding that the injunction should continue pendente lite and the court refused to pursue a contrary course, as the opinion stated, "particularly in a case where the matter at stake is the use of a pier for which rent is being promptly paid and where the cause of difficulty has been entirely removed." The court added that—

"The accusation is freely made that the object of the defendant is ulterior, and that it merely wishes to oust its tenant, so as to procure an increased rental, and this question enters into the merits of the matters in dispute."

At the hearing on the merits the court found that the plaintiffs had violated the lease and that they were not entitled to relief from the forfeiture. It therefore dismissed the bill of complaint and enjoined the plaintiffs from in any manner interfering with the defendant in the sole custody, occupation, and possession of the premises. The court allowed defendant a money judgment in the sum of $59,218.63, with interest thereon from January 24, 1919, together with costs and disbursements; the money judgment being in an amount equal to the fair rental value of the premises from January 24, 1918, found to be $100,000, less $40,000 paid to defendant under a stipulation.

The pertinent provisions of the lease so far as the questions herein involved are concerned may be found in the margin.[1]

The answer alleged as the default whereby defendant was entitled to a forfeiture of the lease that the plaintiff—

"landed and stored, or allowed to be landed and stored, on, in, and about the demised premises, high explosives, and also failed to abide by, perform, and

---

[1] "3. * * * if default be made in the performance of any of the covenants or agreements herein contained, the said hiring and the relation of lessor and tenants shall, at the option of the lessor, wholly cease and determine, and the said lessor shall and may·re-enter the said premises and remove all persons therefrom without recourse to legal proceedings."

"9. The tenants further agree that they will take all proper care of said premises, will not overload them beyond their capacity, and will keep a competent person on said premises at all times, so that the same may be properly guarded and watched.

"10. The tenants further agree that at the expiration of the said term they will quit and surrender said premises and· their appurtenances in as good state and condition as reasonable use and wear thereof will permit, damages by the elements excepted.

"11. The tenants further agree that they will not land nor store, nor allow to be landed or stored, on the said premises, any dynamite or other high explosives, and will remove promptly,· upon written notice to that effect, any merchandise placed upon the said premises which may prejudice the insurance or interfere with the terms of the insurance policies held by the lessor covering the said premises.

"12. The tenants also agree that they will abide by, perform, and carry out any rules, regulations, or orders now or hereafter made or issued by any government authority or department,· either national, state, or municipal, or by the New York Board of Fire Underwriters, or New York Fire Insurance Exchange, with respect to the use or occupation of the herein demised premises."

carry out certain rules, regulations, or orders then duly made and issued by the municipality of the city of New York with respect to the use of the said demised premises, which said rules, regulations, and orders ⁑ ⁑ ⁑ were the ordinances of the city of New York relative to explosives and inflammable materials, some of which are embraced within section 65 of article IV of chapter 10 of the said Code of Ordinances of the City of New York."

The pertinent provisions of the Code of Ordinances of the City of New York are to be found in the margin.[2]

The Italian steamer Napoli, operating under the requisition and control of the Italian government, on January 8, 1918, berthed alongside of Pier 22. The office of the Italian Ministry of Shipping in New York had arranged with different shippers, including the United States Navy Department, for the shipment of various articles of merchandise on the ship and the process of loading was under way. Some of this merchandise was being loaded aboard the Napoli from lighters lying alongside her and other merchandise was being loaded thereon from the pier. Among the merchandise being loaded on the ship were receptacles said to contain harbor defense mines, which in turn were said to contain charges of TNT, a box said to contain detonators, and certain cases said to contain small arms, ammunition, and certain chemicals, viz. monochlor benzol and ammonium nitrate. But none of this alleged objectionable material was ever brought upon the pier. It was brought to the waters adjacent to the pier on lighters operated by the United States government, or the New York Central Railroad Company, and loaded from such lighters directly upon the Napoli. While this boat was being operated as already stated under the requisition and control of the Italian government, she was owned by an Italian corporation, the Trans-Oceanica Societa, the local agent of which was also the agent of the plaintiffs. This agent made inquiry of the Italian Ministry of Shipping and of the representatives of the United States Navy Department as to whether any of the goods to be loaded aboard the Napoli were explosive or dangerous, and was assured that the goods were nonexplosive and nondangerous, and that the receptacles were to be filled and made ready for use only when they reached the other side and were about to be deposited in Italian waters.

It further appears that after certain of the harbor defense mines had been loaded aboard the Napoli and while a New York Central car float containing seven sealed cars said to contain other such mines was lying outside other lighters at Pier 22, the New York Fire Department required the master of the Napoli to keep a tug in attend-

---

[2] "The commander, owner or owners of any vessel arriving in the port of New York, carrying explosives or explosive material in excess of the amount required for the ship's own use for signaling and life-saving purposes shall, before approaching nearer than one thousand feet to any pier line of the city, obtain a permit therefor from the fire commissioner. The retention for more than forty-eight hours on board of any ship lying at a dock, pier or bulkhead within the city of any explosives, or explosive material in excess of the amount required for the ship's own use for signaling or life-saving purposes, is prohibited." Subdivision 1, § 65.

"No person shall land or place explosives upon a dock, pier, bulkhead or other landing place." Subdivision 4, § 65.

ance on the Napoli ready to tow it out into the stream if occasion arose. And thereafter the fire department required the car float to which reference has before been made to be removed from the vicinity of the pier and the harbor defense mines in the Napoli to be discharged therefrom and also removed from the vicinity of the pier. Thereafter the defendant sent to plaintiffs the notice, hereinbefore referred to, claiming the forfeiture of the lease.

The plaintiff is in this court claiming: (1) That the terms of the lease heretofore cited in the margin—section 11—were not violated, inasmuch as the alleged objectionable material was never "on the said premises," meaning Pier No. 22. (2) That section 12, also found in the margin, has not been violated, inasmuch as all rules or orders made thereunder were performed and carried out. (3) That the material alleged to be objectionable was not proven to be so in fact.

[1] The burden of proof rests upon a party seeking to establish a forfeiture. In Henderson v. Carbondale Coal & Coke Co., 140 U. S. 25, 11 Sup. Ct. 691, 35 L. Ed. 332, the court declared that forfeitures are never favored, and added:

"Equity always leans against them, and only decrees in their favor when there is full, clear, and strict proof of a legal right thereto."

The law looks upon a forfeiture as a harsh way of terminating contracts, and one who insists upon forfeiture is himself held "to walk strictly within the limits of the authority which gives the right." Palmer v. Ford, 70 Ill. 369, 377. With this rule as to the burden of proof in mind, did the defendant establish by full, clear, and strict proof that the Napoli was loaded with explosive mines? The fact has been adverted to that the agent in charge had been assured by the Italian Ministry of Shipping and by the representatives of the Navy Department of the United States that the goods were nonexplosive and nondangerous, and that the receptacles were to be filled and made ready for use when they reached the other side.

The testimony is that Carlo Pfister, commander in the Royal Navy of the kingdom of Italy and representing that Navy at the port of New York, and who acted under the orders of the Italian naval attaché at Washington, informed the agent in charge of the loading of the Napoli that the mines contained nothing, were empty, and nonexplosive. The Italian Minister of Shipping, who had charge of shipments for the Italian government in United States ports, testified that he assured the agent that the mines were harmless and nonexplosive.

There is testimony that Capt. Olmstead, of the United States Navy, in charge of the delivery and shipping of mines at the Navy Yard, informed the agent in charge of the loading of the Napoli that the mines were empty and nonexplosive, and like testimony that similar assurance was given by Lieut. Henriques, also of the United States Navy, an officer in the combustibles shipping department at the Navy Yard at New York. There is, however, an affidavit, offered by the defense, made by three persons, in which affidavit it is stated that Capt. Olmstead admitted to them that the mines contained the usual charge for coast defense mines, but that they did not have any det-

onators or primers in them. The same affidavit declared that Lieut. Henriques had stated that each mine contained 250 pounds of trinitrotoluol ('TNT), but that the mines had no detonators or igniters in them. Neither Capt. Olmstead nor Lieut. Henriques were called as witnesses, and no explanation of the contradictory statements was given.

The defendant's witnesses testified that the only information they had as to the explosives on the cars was that each of the seven cars on the float was labeled "Explosives." The evidence shows that it was not the practice to ship empty mines with explosive labels. The regulations of the Interstate Commerce Commission require accuracy in labels where explosives are involved. The explosive signs on the cars were each about a foot square and had in large red letters: "Explosives. Keep away from fire." Each car also had displayed upon it inspector's signs certifying the car was in proper condition to carry explosives. The cars came from Iona Island, the federal government's place of storage of explosives. The waybills of one of the cars states contents as "33 N.D. mines TNT." And the witness Koch, the assistant inspector of combustibles for the New York fire department, testified that he saw on the Napoli the metal structures which he called mines and which he admitted he did not examine. He was asked, "And you don't know of your own knowledge what they contained, or whether they were empty?" To which he answered, "No." The testimony of the other witnesses called for defendant was of similar import. The testimony showed that it was the general practice to ship such mines empty, the contents to be filled in on the other side, when they were about to be used. The chief officer of the Napoli, who superintended the handling of the so-called mines, was convinced that they were empty because of their weight, and because two of them had fallen a distance of 10 feet without exploding; and the mate testified that he regarded the cargo as the safest he had carried for a period of three years.

[2] The testimony does not clearly show that the mines were filled with explosives. The testimony is not direct, but is circumstantial, and somewhat conflicting as respects the explosive character of the mines. But on examination of the record it appears that there is credible testimony which supports the findings of the court below that high explosive mines were on the Napoli and on the float, both of which were moored to the pier for several days, and we think that finding is under all the circumstances conclusive upon this court on this appeal. Butte Superior Co. v. Clark-Montana Co., 249 U. S. 12, 39 Sup. Ct. 231, 63 L. Ed. 447; Ryan v. Ohmer, 244 Fed. 31, 38, 156 C. C. A. 459.

The only articles which were at any time on the pier were some boxes said to contain small arms, ammunition, and some cases said to contain monochlor, benzol, and ammonium nitrate. These were not classed as explosives by the New York fire department according to the testimony of the chief inspector of the fire prevention bureau of the city of New York, and no permit was required for their transportation or for their temporary storage on a pier pending shipments

abroad. The District Judge was right in saying that the real question was whether the lease was broken because of what occurred with respect to the ship Napoli, meaning the loading of that ship with the mines. The evidence as to what was placed on the pier was properly regarded as irrelevant; it not appearing that it was explosive.

, [3] The provision in the lease which it is claimed has been violated is found in paragraph 11, in which the plaintiffs agreed that they would "not land nor store nor allow to be landed or stored on the said premises any dynamite or high explosive." The court below has not found that any explosives were ever landed on the pier. He has found, as we have seen, that they were on the vessel and on the lighter, and that the vessel and the lighter were moored to the pier. The question which this gives rise to, therefore, is whether explosives so placed are on "the said premises" within the meaning of the paragraph to which reference has been made. Does the term "the said premises," in the connection in which it is used, include both the pier and the slips adjacent thereto and vessels moored thereat? The lessor, in paragraph 1 of the lease, demises "the premises known as Columbia Pier No. 22 with its appurtenances." In paragraph 9 the lessees agree to take proper care "of said premises," and that they will not overload them beyond their capacity, and that they will keep a competent person on said premises. In paragraph 10 the lessees agree that at the expiration of said term they will quit and · surrender "said premises and their appurtenances." Then in paragraph 11, heretofore cited, the lessees agree not to allow to be landed or stored "on the said premises" any dynamite or other high explosive.

The argument is that it cannot be said in favor of the lessor that the term "said premises" has a more extensive meaning in paragraph 11 than it had in paragraph 10. In paragraph 10 the term "the said premises," it is clear, is not meant to include the appurtenances of the pier. In that paragraph the term "said premises" obviously refers to the pier itself. Likewise in paragraph 9 "said premises" again obviously refers to the pier itself for the agreement is not to overload them beyond their capacity. And in paragraph 17 the term the "said premises" again obviously refers to the pier and the buildings thereon. The pertinent portion of· the paragraph last referred to may be found in the margin.[3]

[4] So all through the lease the term "premises" is used to indicate the pier itself, rather than the pier and the water in the vicinity of the pier, or the slips adjacent to the pier, or the vessels moored thereat. But for the purpose of enabling the lessor to forfeit the lease we are asked to give to the term "the premises" a more extensive

---

[3] "In case the said pier or the buildings erected thereon shall be partially or wholly destroyed by fire, the lessor shall proceed with all reasonable diligence to repair or rebuild the same at its own expense and that until the said premises are restored or rebuilt the lessor will,. * * tender to the tenant * * * pier room * * * equal as far as possible in area to that which the said tenants shall have been deprived of by the partial or entire destruction of the said premises."

meaning than that expression has in the other paragraphs of the lease. We are asked, not only to give to the term a different meaning, but to give to it the widest meaning possible, and to construe it in favor of the lessor and against the lessee. It is a familiar canon of construction that leases are to be most strongly construed against the lessor, and that if there be any doubt and uncertainty as to the meaning of the lease it is to be construed most strongly in favor of the lessee. In re Wait, 7 Pick. (Mass.) 100, 19 Am. Dec. 262; Reynolds v. Washington Real Estate Co., 23 R. I. 197, 49 Atl. 707; Griffiths v. Henderson, 49 Cal. 566. The lease of a pier ordinarily includes all the rights and privileges possessed by the lessor in the demised premises, including the right to have vessels load and unload at the pier. The term "premises" in a lease of a pier no doubt carries with it all the rights and privileges which the lessor possesses in the adjacent waters, or so much of said waters as are necessary to the complete enjoyment of the pier for the purpose for which it is let. The lease of a pier, like the lease of a building, is a lease of everything which belongs to it, or is used with and appurtenant to it, and which is reasonably essential to its enjoyment, and all that so passes constitutes the "premises" leased for the purpose of determining the extent of the demise. But where throughout a lease the lessor distinguishes between "the premises" and "the appurtenances," giving to the term "premises" a restricted meaning, as evidently is the case in the lease herein involved, the lessor may be held, especially in a forfeiture clause, strictly to the restricted meaning.

Immediately after the explosion at Black Tom, and on October 7, 1916, the defendant sent the plaintiff, its other lessees, and its customers a communication concerning its attitude toward the storing or handling of explosives in which it declared:

"This company does not accept for storage any articles which are prohibited by the New York Board of Fire Underwriters, nor does it permit such material to be handled upon its property, or to be loaded in steamers while berthed at its piers."

It is true that this communication can neither increase nor take from the rights which the lessor has against the lessee under the particular lease now under consideration. It is, however, of interest that, as in the lease, the lessor distinguishes between its property, by which it undoubtedly meant the pier, and the adjacent waters or slip or appurtenances. The lease, unlike the notice, contains nothing which expressly prohibits the loading of steamers while berthed at the pier, provided the explosives are not taken into the vessel from the pier. And in this case they were not so taken.

Subdivision 1 of section 65 of the Code of Ordinances of the City of New York, it is true, imposes a duty upon the master and the shipowner, and they are the persons in whose custody the explosives are when once they are placed on board the vessel. Whether, however, the plaintiff is in any manner affected by its provisions will presently appear.

So far as subdivision 4 of section 65 of the same Code is concerned, it is clear that plaintiff did not violate it. That provision re-

lates to placing explosives upon a dock, pier, bulkhead, or other landing place, and there is no evidence, as we have said, that the plaintiff brought explosives upon the pier.

[5] This court, however, is satisfied that, while the lease could not be forfeited and the tenancy could not be determined upon the grounds already discussed, nevertheless defendants had the right to exercise their option and terminate the lease. In paragraph 12, heretofore cited, the lessees agreed to abide by, perform, and carry out any rules, regulations or orders made by any government authority or department, "either national, state, or municipal, or by the New York Board of Fire Underwriters or New York Fire Insurance Exchange," with respect to the use of the demised premises. The evidence discloses that plaintiffs did not keep this agreement. They violated that part of clause 1 of section 65 of chapter 10 of the Code of Ordinances of the City of New York which prohibited the retention for more than 48 hours on board of any ship lying at a dock, pier, or bulkhead within the city of explosives in excess of the amount required for the ship's own use. They also violated the rules and regulations of the War Department for the loading of explosives. Rule 10 of the rules and regulations declares that—

"No explosives will be allowed to be placed aboard a vessel until the rest of the cargo has been placed aboard and the vessel trimmed."

And rule 27 of the rules and regulations concerning the anchorage grounds declares that "vessels carrying gunpowder or other explosives may anchor only as follows," and Columbia Pier No. 22 is not within the designated anchorage grounds. And in allowing the Napoli to be tied up to Pier No. 22 plaintiffs were allowing the pier or "the demised premises," giving to that term the same narrow and restricted meaning heretofore given it in this opinion, to be used contrary to the agreement in paragraph 12 of the lease.

[6] The plaintiff, while insisting that no forfeiture was incurred, insists that, if the court is of a contrary opinion, the forfeiture is one which a court of equity will relieve against. To relieve against a forfeiture, as has been said, is one of the oldest and best established functions of a court of equity. Story on Equity Jurisprudence, § 1315. But equity, it is equally well known, does not relieve against all forfeitures, but only in a certain limited class of cases. It is uniformly held that courts of equity do not interfere to relieve from forfeitures arising from breach of covenants and conditions, where there cannot be any just compensation decreed for the breach. As said by Lord Chancellor Macclesfield in Peachy v. Duke of Somerset, 1 Strange, 447, "it is the recompense that gives this court a handle to grant relief," and the general rule is that equity will not give relief in cases of forfeiture growing out of breach of covenant for doing any specific act other than the payment of money and where the damage incurred by nonperformance is susceptible of pecuniary measurement and therefore of compensation. Kann v. King, 204 U. S. 43, 55, 27 Sup. Ct. 213, 51 L. Ed. 360; Clark v. Barnard, 108 U. S. 436, 2 Sup. Ct. 878, 27 L. Ed. 780; Bispham's Equity (8th Ed.) § 181. And certainly to recognize the right to be relieved from a

forfeiture in such a case as the one now before the court would find no support in any of the authorities.

[7] The defendant in its answer set up, by way of counterclaim arising out of the transaction, the loss which it had suffered by being deprived of the use and occupation of the premises from the time of the service upon it of the restraining order heretofore mentioned. The court below therefore properly allowed a money judgment for the use and occupation by the plaintiffs of defendant's property after the termination of the lease. The lease was terminated on January 23, 1918. The plaintiffs alleged the leasehold value was $120,000 per annum. The defendant's witness testified that it was worth $100,000 per annum. The court accepted the lower figure. Pending the trial the parties had stipulated that the amount specified in the lease should be paid without prejudice to either party, and without its being deemed a recognition of the relation of landlord and tenant. The court allowed defendant the difference between the two amounts as compensation for plaintiff's use and occupation. It is now objected that the court had no power to grant a money judgment, because no bond was exacted from plaintiffs at the beginning of the litigation.

It may be conceded that plaintiffs should not be charged with damages caused to defendant's business by an erroneous injunction in a case in which no bond was asked or given. No such damages have been recovered in this case. The money judgment which has been obtained is not for damages caused by an erroneous order, but it is compensation for the use and occupation of defendant's premises during the time they were in plaintiff's possession. It cannot be that plaintiff should be permitted to use and occupy defendant's premises without right, and escape responsibility for making compensation for such use and occupation because they held under an erroneous order. Where a former tenant under a lease retains possession of premises after the termination of the lease, he is liable for the value of the use and occupation so retained. The judgment given is clearly within the principle applied in Arkadelphia Co. v. St. Louis, etc., Ry. Co., 249 U. S. 134, 39 Sup. Ct. 237, 63 L. Ed. 517. In Horsburg v. Baker, 1 Pet. 232, 236 (7 L. Ed. 125), Chief Justice Marshall said:

"As a court of chancery is not the proper tribunal for enforcing forfeitures, no decree for the purpose of effecting that object, ought to have been made."

The Supreme Court in Marshall v. Vicksburg, 15 Wall. 146, 149 (21 L. Ed. 121), declared that—

"Equity never, under any circumstances, lends its aid to enforce a forfeiture or penalty, or anything in the nature of either."

And in Foley v. Grand Hotel Co., 121 Fed. 509, 57 C. C. A. 629, it was said:

"Courts of equity will grant relief against a forfeiture which has been incurred through accident or mistake, or by reason of any fraudulent, oppressive, or unfair conduct on the part of one who is asserting a right of forfeiture; but a chancellor will not lift his hand to aid a litigant in enforcing a forfeiture."

The defendant, however, did not come into the court to obtain a forfeiture of the lease. He was brought into the court by the plaintiffs, and what he claims is that, inasmuch as the plaintiffs' rights in the lease have been already terminated under paragraph 3 of the lease, the lessor having exercised its option in favor of its termination, the plaintiffs, their agents, servants, and employés should be required to remove from the demised premises, and be enjoined from interfering with the defendant in the sole custody, occupation, and possession of the premises.

[8] When a court of equity acquires jurisdiction for any purpose, it will as a general rule proceed to determine the whole cause, though in so doing it decides questions which standing alone would furnish no basis of equitable jurisdiction. In McGowan v. Parish, 237 U. S. 285, 296, 35 Sup. Ct. 543, 548 (59 L. Ed. 955), the Supreme Court said:

"But 'a court of equity ought to do justice completely, and not by halves,' and a cause once properly in a court of equity for any purpose will ordinarily be retained for all purposes, even though the court is thereby called upon to determine legal rights that otherwise would not be within the range of its authority. Camp v. Boyd, 229 U. S. 530, 551, 552 [33 Sup. Ct. 785, 57 L. Ed. 1317]."

Decree affirmed.