EMERY BIRD THAYER DRY GOODS CO. et al. v. WILLIAMS et al.*

WILLIAMS et al. v. EMERY BIRD THAYER DRY GOODS CO. et al.

Nos. 10853, 10854.

Circuit Court of Appeals, Eighth Circuit.

July 13, 1938.

Armwell L. Cooper and Wallace Sutherland, both of Kansas City, Mo. (Ellison A. Neel, William E. Kemp, and Cooper, Neel, Kemp & Sutherland, all of Kansas City, Mo., and Frank E. Atwood, of Jefferson City, Mo., on the brief), for Emery Bird Thayer Dry Goods Co. et al.

Barton Corneau, of Boston, Mass. (Henry M. Channing, of Boston, Mass., Robert B. Caldwell, of Kansas City, Mo., Channing, Corneau & Frothingham, of Boston, Mass., and McCune, Caldwell & Downing, of Kansas City, Mo., on the brief), for Moses Williams et al.

Paul R. Stinson, of Kansas City, Mo., amicus curiæ.

Before GARDNER, WOODROUGH, and BOOTH, Circuit Judges.

GARDNER, Circuit Judge.

There are here presented an appeal and a cross-appeal from the decree construing the obligations of a lease with respect to rent, and refusing a forfeiture of the lease.

The Emery Bird Thayer Dry Goods Company and the Emery Bird Thayer Realty Company were plaintiffs below, while Moses Williams, William Minot, Edwin D. Brooks and William B. Baker, Trustees of Boston Ground Rent Trust, were defendants. The defendants are trustees of the Boston Ground Rent Trust, a common-law or Massachusetts trust, and are owners of the property involved. The original owner of the building on the property had acquired the fee to the land and was erecting a building on it prior to the execution of the lease. An agreement was entered into, by which the then owner sold the premises to the defendants' predecessors, and they concurrently executed a ninety-nine year lease to the then owner. The deed and lease to the property were concurrently executed in April, 1890, and as a part of the same transaction. In 1898, the lessee assigned the lease to the plaintiff, Emery Bird Thayer Dry Goods Company. In 1908, the plaintiff, Emery Bird Thayer Realty Company, was organized, and the lease was then assigned to it, and the Dry Goods Company, by a concurrently executed instrument, then became sublessee of the Realty Company for a term ending three months prior to the expiration of the lease. The Dry Goods Company expressly assumed the obligations of the lessee under the lease.

Prior to the execution of the lease, there were certain negotiations, evidence concerning which was for the most part excluded. The lease is dated April 11, 1890, and is for a term of ninety-nine years from its date. It contains provision for payment of rent as follows:

"Said lessee covenants and agrees to deliver to the lessors, as yearly rental for said demised premises, at such office of the lessors, or their agent, or at such bank, in said city of Kansas City, or in the City of New York, or in the City of Boston, as the lessors may, from time to time, designate, Thirty-three Thousand Dollars ($33,000) in gold coin of the United States of the present standard of weight and fineness, in four quarterly yearly installments, each in advance, of Eight Thousand Two Hundred and Fifty Dollars ($8,250) each, on the First days of April, July, October, and January, in each and every year during the first four years of this lease, the first delivery to be made on the First day of April, 1890; Eighty Thousand Dollars ($80,000) in such gold coin in four instalments as follows, namely:—Fifty-seven Thousand Five Hundred Dollars ($57,500) on the

First day of April, 1894, Seven Thousand Five Hundred Dollars ($7,500) on the first day of July, 1894, Seven Thousand Five Hundred Dollars ($7,500) on the First day of October, 1894, and Seven Thousand Five Hundred Dollars ($7,500) on the first day of January, 1895, during the fifth year of this lease; Seventy-seven Thousand Dollars ($77,000) in such gold coin in four instalments as follows, namely:—Fifty-six Thousand Seven Hundred and Fifty Dollars ($56,750) on the first day of April, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of July, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of October, 1895, Six Thousand Seven Hundred and Fifty Dollars ($6,750) on the first day of January, 1896, during the sixth year of this lease; Seventy-four Thousand Dollars ($74,000) in such gold coin, in four instalments as follows, namely:—Fifty-six Thousand Dollars ($56,000) on the first day of April, 1896, Six Thousand Dollars ($6,000) on the first day of July, 1896, Six Thousand Dollars ($6,000) on the first day of October, 1896, and Six Thousand Dollars ($6,000) on the first day of January, 1897, during the seventh year of this lease; and Five Hundred and Fifty-seven Thousand, Two Hundred and Eighty (557,280) grains of pure, unalloyed gold, in four quarter-yearly instalments, each in advance, of One Hundred and Thirty-nine Thousand, Three Hundred and Twenty (139,320) grains each, on the first days of April, July, October and January, in each and every year during the remaining ninety-two (92) years of said period of ninety-nine (99) years, the first delivery of such pure gold to be made on the First day of April, 1897.

"Provided, however, that the lessors may, from time to time at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment, at the time and place appointed for such delivery, of the sum of Six Thousand Dollars ($6,000), in such lawful currency of the country as the lessors may designate."

Up to January 1, 1934, all payments due the lessors were made by checks or drafts, which the lessors accepted and cashed.

On June 5, 1933, a Joint Resolution of the Congress (48 Stat. 112) became effective. Other congressional legislation (the Emergency Banking Act of March 9, 1933 (48 Stat. 2), and the order of the Secretary of the Treasury of December 28, 1933) became effective in that year, so that on January 1, 1934, it became and ever since has been impossible for plaintiffs to deliver gold to the defendants as required by this lease.

Defendants demanded payment in gold, but offered temporarily to accept in lieu of the 139,320 grains of gold, the number of dollars equal to the amount which the Government would then pay for a like amount of newly mined gold. They threatened forfeiture unless plaintiffs paid $10,158.75 per quarter. Plaintiffs, coerced by these threats, paid to defendants, under protest, the amounts per quarter demanded until and including the payment falling due April 1, 1935. As a precautionary measure, plaintiffs attempted to procure from the Treasury Department a license to acquire gold, newly mined or otherwise, to comply with the terms of the lease, but in this it was unsuccessful.

The payments of the several quarter-annual amounts of $10,158.75, made by plaintiffs to defendants, were receipted for by defendants in the following form:

"The Trustees of the Boston Ground Rent Trust have this day received from Emery Bird Thayer Dry Goods Co. its check for Ten Thousand One Hundred Fifty Eight and 75/100 ($10,158.75) Dollars. This check (subject to collection) is accepted by said Trustees as equivalent to the delivery to them of 139,320 grains of pure unalloyed gold (on the basis that the gold content of the dollar was established January 31, 1934, by proclamation of the President of the United States, issued under Act of Congress, as fifteen and 5/21st (15 5/21) grains of gold, nine-tenths (9/10) fine, as the quarterly delivery of rent, due July 1, 1934, under the lease * * *."

Plaintiffs' amended bill of complaint prays that the court adjudge (1) that the provisions of the lease requiring the delivery of gold bullion as rental are unlawful and void; (2) that the quarter yearly rental under the lease is and may be satisfied by the payment of $6,000 in lawful currency of the United States; and (3) that the defendants be perpetually enjoined from forfeiting or attempting to forfeit the lease, as long as plaintiffs shall pay the rent in the amount of $6,000 quarter-annually and perform the other covenants of the lease.

Defendants in their answer and cross-complaint, deny the applicability of the Joint Resolution or other Acts of Congress to the lease, and challenge their constitutionality as applied to the lease. They ask decree of forfeiture of the lease because plaintiffs have not tendered gold since January 1, 1934, in satisfaction of the rentals thereunder.

The lower court denied forfeiture, but decreed that plaintiff must pay an amount in currency equal' to the present value of the required gold if lawfully delivered.

On this appeal plaintiff contends: (1) That the Joint Resolution of June 5, 1933, applies to the provision for the delivery of gold; and (2) that the measure of compensation is $6,000.00 quarter-annually.

The defendants, on their cross-appeal, contend that the lease could only be satisfied by the delivery of gold, and since it could not be delivered, the lease became subject to forfeiture.

The Joint Resolution of June 5, 1933, 48 Stat. 112 (31 U.S.C. § 463, 31 U.S.C.A. § 463) provides as follows:

"Whereas the holding of or dealing in gold affect the public interest, and are therefore subject to proper regulation and restriction; and

"Whereas the existing emergency has disclosed that provisions of obligations which purport to give the obligee a right to require payment in gold or a particular kind of coin or currency of the United States, or in an amount in money of the United States measured thereby, obstruct the power of the Congress to regulate the value of the money of the United States, and are inconsistent with the declared policy of the Congress to maintain at all times the equal power of every dollar, coined or issued by the United States, in the markets and in the payment of debts. Now, therefore, be it

"Resolved by the Senate and House of Representatives of the United States of America in Congress Assembled, That (a) every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

"(b) As used in this resolution, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations."

Putting aside for the moment the alternative optional provision of the lease, which provides for payment of $6,000.00 in currency, the first question presented is whether the provision for payment "in grains of pure unalloyed gold" is within the scope of the congressional Joint Resolution. The Resolution, in subsection (a) of the first section, declares that "every provision contained in or made with respect to any obligation" which purports to give the obligee certain rights of payment are against public policy. Subsection (b), however, limits the meaning of the word "obligation" to one "payable in money of the United States."

It is a general rule that where a statute defines the meaning of words used therein, the statutory definition must prevail, regardless of what other meaning may be attributable to it by other authorities, or even by common understanding. Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780. The meaning of a statute must first be sought in the language which it employs. United States v. Standard Brewery, 251 U.S. 210, 40 S.Ct. 139, 64 L.Ed. 229; Lansdown v. Faris, 8 Cir., 66 F.2d 939. No definition of the term "money of the United States" is found in the Joint Resolution. The provisions of the lease under consideration do not in terms make the obligation for rent "payable in money of the United States," but it is made payable "in grains of

pure unalloyed gold." Can it be said that "grains of pure unalloyed gold" is equivalent to the expression "money of the United States"? The term "money of the United States" is susceptible of more than one meaning. Webster's New International Dictionary gives a number of definitions of money, among others the following:

"Metal, as gold, silver, or copper, coined or stamped, and issued by the recognized authority as a medium of exchange; coin in general."

\* \* \* \* \* \*

"In a comprehensive sense, anything customarily used as a medium of exchange and measure of value, as sheep, wampum, copper rings, quills of salt or of gold dust, shovel blades, etc., hence, Econ., anything having a conventional use (1) either as a medium of exchange or a measure of value or (2) as a measure of value alone."

The word "bullion" may import money. Counsel v. Vulture Mining Co., 5 Daly, N. Y., 74. Primarily the coinage does not create the standard by which other commodities are measured, but the intrinsic value of the precious metal in the markets of the world. The stamp which the Government impresses upon the coin is simply a guaranty of weight and fineness. The science of economics teaches that originally gold and silver were employed as money in their unmarked form, each transaction calling for a pair of scales with which to weigh the amount needed for a given transaction, but as time went on, to avoid this cumbersome practice, metals of convenient size were made and a mark was placed upon them to indicate weight and quality. These precious metals were fundamentally the basic money or monetary commodities of commerce and as such they furnished the standard of value with which all other values were compared.[1] From 1900 until the Joint Resolution became law, gold was the standard money of the United States, all other forms of coins or currencies being of a fiduciary nature, and their value as a medium of exchange being based on exchange for or redemption by gold.

The Federal Constitution and statutes indicate that there may be a difference between the word "coin" and the word "money." Article 1, Section 8, of the Constitution, U.S.C.A.Const. art. 1, § 8, gives Congress power "to coin Money, regulate the value thereof, and of foreign Coin, and fix the Standard of Weights and Measures." The power given is "to coin money." This must mean to put an imprint upon that which is adopted as money.

In Ling Su Fan v. United States, 218 U.S. 302, 31 S.Ct. 21, 54 L.Ed. 1049, 30 L.R.A.,N.S., 1176, the court says (page 23):

" \* \* \* public law gives to such coinage a value which does not attach as a mere consequence of intrinsic value. Their quality as a legal tender is an attribute of law aside from their bullion value. They bear, therefore, the impress of sovereign power which fixes value and authorizes their use in exchange."

"To coin money," therefore, is the act of impressing symbols on bullion that has already been adopted as the money of a government. Bronson v. Rodes, 7 Wall. 229, 19 L.Ed. 141. Succeeding language in the same clause of the Constitution, to "regulate the Value thereof, and of foreign Coin," emphasizes this thought. The value to be regulated is the value of money. As to foreign coin, no such power is asserted, but the power there granted is "to regulate" the value of coin. Article 1, Section 8, U.S.C.A. art. 1, § 8, also confers the power to provide for the punishment of counterfeiting the securities and current coin of the United States. The significance of this lies in the fact that while previously in the same clause, the power given is to coin money, the punishment of counterfeiting, as respects metals, is confined to coins, the product of the act of coinage, and not money.

Statutes observe this same distinction. The Bureau of Mints has under its control all mints for the manufacture of coin. 31 U.S.C.A. § 251. In 1893, it was declared to be "the policy of the United States to continue the use of both gold and silver as standard money, and to coin both gold and silver into money of equal intrinsic and exchangeable value, such equality to be secured through international agreement, or by such safeguards of legislation as will insure the maintenance of the parity in value of the coins of the two metals, and the equal power of every

---

[1] Kiekhofer, Economic Principles, Problems and Policies, pp. 255, 257, 259, 261, 265; Holdsworth, Money and Banking, p. 11; Dowrie, Money and Banking, pp. 3, 7; Phillips American Government, pp. 665, 666, 669.

dollar at all times in the markets and in the payment of debts." 31 U.S.C.A. § 311. In this statute, the first reference to money is the comprehensive term, while immediately following is a reference to it as the product of coinage. 31 U.S.C.A. § 312, provides for representation of the United States at an international conference called "with a view to securing by international agreement a fixity of relative value between gold and silver as money by means of a common ratio * * *." Revised Statutes, § 3511, Act of March 14, 1900, § 1, 31 U.S.C.A. § 314, provided that the dollar, consisting of 25⁸⁄₁₀ grains of gold ⁹⁄₁₀ fine, should be the standard unit of value, and all forms of money issued or coined by the United States should be maintained at a parity of value with that standard. Gold coins, silver coins, and minor coins of the United States have been designated by statute. Revised Statutes, §§ 3511, 3513 and 3515, 31 U.S.C.A. §§ 315–317. There have also been passed from time to time statutes for forming gold and silver bullion into bars. Revised Statutes, §§ 3518 and 3520, 31 U.S.C.A. §§ 325, 328. Revised Statutes, § 3536, 31 U.S.C.A. § 349, provides for money of account of the United States to be expressed in dollars, or units, dimes or tenths, cents or hundredths, and mills or thousandths. Provision is also made for issuing currency. 31 U.S.C. §§ 401–430.

Our investigation indicates that any one of three meanings may be attributable to the term "money": (1) Gold or silver as the monetary standard of the Nation; (2) coins and currency actually circulating as a medium of exchange; or (3) the unit of value, the dollar. This third meaning is sustained by judicial authority. Thus, in United States v. Van Auken, 96 U.S. 366, 24 L.Ed. 852, the court said (page 368):

"A dollar is the unit of our currency. It always means money, or what is regarded as money."

■ An exhaustive study of the authorities bearing on this subject has not, of course, been possible, but we think it has been demonstrated that the word "money" is not one that, apart from the context or setting in which it is used, may have an absolutely definite, unvarying, and fixed meaning. Recurring now to the Joint Resolution, it is observed that the words "money of the United States," and the words "coin" and "currency" are

found in juxtaposition, and in subsection (b) of the first section manifestly used as terms or subjects of definition. Apparently, Congress did not treat "money of the United States" as synonymous with "currency or coin of the United States." If the terms gold and silver, or currency and coin, or all of them, should be substituted by definition in the first part of subsection (a), as the equivalent of obligation of the United States, so that it would read, "every provision contained in or made with respect to any obligation payable in gold, silver, coin or currency of the United States," then there would be a manifest repetition, if not absurdity, in continuing on to the latter words, "which purports to give the obligee a right to require payment in gold, or a particular kind of coin or currency, or in an amount in money of the United States (gold, silver, coin, or currency) measured thereby." Congress may, of course, express itself tautologically (United States v. Lucius Beebe & Sons, 1 Cir., 122 F. 762), but that it has done so is a conclusion or interpretation to be avoided if fairly possible. A construction resulting in absurdity or unreasonableness should not be adopted if another construction is equally tenable.

If the obligation, payable in money of the United States, is construed as one payable in dollars, then what follows in subsection (a) of the first section is entirely consistent. Such exactions are then made contrary to public policy, whether payable in gold, or a particular kind of coin or currency, or in an amount in money of the United States (dollars) measured thereby. This construction is strengthened by the following sentence:

"Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, *dollar for dollar*, in any coin or currency which at the time of payment is legal tender for public and private debts." (Italics supplied).

Such conversion is to be from dollar to dollar.

■ An agreement to pay or deliver a certain number of grains of gold is not, we think, within the Joint Resolution. The argument that the acts of the parties, as well as the language of the lease, demonstrated that the agreement for delivery of gold was an agreement for the delivery of gold as an equivalent of money is aside

from the point. Congress has not legislated as to such contracts. Language from the case of Holyoke Water Power Co. v. American Writing Paper Co., 300 U.S. 324, 57 S.Ct. 485, 81 L.Ed. 678, is cited as authority for the proposition that an equivalence is sufficient. But the agreement considered by the court in that case was to pay a quantity of gold which should be equal in amount to 1500 dollars of the gold coin of the United States, of the standard of weight and fineness of the year 1894, or the equivalent of "this commodity" in United States currency. The court said (page 488):

"A contract for the payment of gold as the equivalent of money, and a fortiori a contract for the payment of money measurable in gold, is within the letter of the Joint Resolution of June 5, 1933, and equally within its spirit."

Other language in the opinion, we think, throws light on what was intended by the court by the use of these quoted words. It is further said:

"But very definitely, the evil does include transactions whereby gold, coined or uncoined, is to be delivered in satisfaction of a debt expressed *in terms of dollars,* payment, not sale, being then the end to be achieved. As definitely, indeed more obviously, the evil includes transactions whereby a debt is to be discharged, *not in bullion, but in dollars,* if the number of the dollars is to be increased or diminished in proportion to the diminution or the increase of the gold basis of the currency. Both forms of obligation are illustrations of the very mischief that Congress sought to hit." (Italics supplied)

The equivalence to be found in the obligation, then, is one of gold to *dollars,* or *dollars* to gold. If the contract is of that nature, it is within the Joint Resolution, but the contract as written must be the guide. In the lease here considered, the quantity of gold is not measured by any other standard of value, and this, we think, is important. The lessors had the right to require payment in gold of a certain number of ounces. The alternative provision does not affect the nature of that obligation unless asserted by the lessors, in which event it is not changed, but a substitution is made. The lessors are given two options or alternatives, and if one is exercised, the other, for the time being, is eliminated. They co-exist, and, doubtless, the obligees had in mind that either

alternative, if conditions remained the same as when the contract was signed, would yield substantially an equal return. In legal effect, there is such independence, one of the other, that neither can be said to have been made with respect to or dependent upon the other. The Joint Resolution contains this language:

"Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto * * *."

It seems clear that the Congress intended to condemn as against public policy and to render invalid such provisions, whether contained in the same obligation or in some other obligation, so long as there was a legal relationship by contract, which in any way conditioned or affected the obligation to pay, so that gold, *measuring or measured by money,* could be demanded of the obligee. The language of the lease indicates the independence of the optional provision. The lessee covenants and agrees to deliver to the lessors, as yearly rental, for the first seven years, stated amounts in gold coin, and after that, to deliver the stated quantity of grains of pure, unalloyed gold. Following this is the option, which reads as follows:

"Provided, however, that the lessors may, from time to time, at their option, require in lieu of any such quarter-yearly delivery of pure, unalloyed gold, the payment, at the time and place appointed for such delivery, of the sum of Six Thousand Dollars ($6,000), in such lawful currency of the country as the lessors may designate."

The amicus curiae contends that the rental payments were in the alternative, and since delivery of the gold has become impossible, the other alternative becomes the obligation. Where there are promises in the alternative, the fact that one of them has become impossible of performance does not in itself relieve the promissor from performing the other. Yankton Sioux Tribe v. United States, 272 U.S. 351, 47 S.Ct. 142, 71 L.Ed. 294. If the lessors had elected between the two modes of performance, this rule might apply. There is, however, no such requirement, express or implied. The agreement is that the lessee shall pay, and, perforce, the lessors shall receive, the gold payments or deliveries as rent. The lessors, to be sure, may, if they so choose, exercise an option to take $6,000 in lawful currency, in lieu of the

quarter annual instalments of gold, but there is no requirement that they exercise the option, and there are no alternative promises. An intention to the contrary can not be escaped in this particular contract. There is only one obligation and one corresponding right between the obligors and the obligees. In no sense, are there alternative promises or obligations.

This brings us to the issue presented on the cross-appeal of the defendants. It is their contention that the lower court erred in decreeing that plaintiffs might discharge the obligation to deliver gold by the payment of lawful currency of the United States in an amount equal in value to the value the gold would have had if lawfully delivered. It is admitted that it has actually become impossible to make delivery of the gold, and that this impossibility has been created by law, and without fault of either of the parties.

The lease contains provision for forfeiture, which reads in part as follows:

"This lease is made upon the condition that the lessee shall punctually keep and perform all its covenants and agreements hereunder; and in case it fails to keep and perform any of its covenants, or agreements hereunder, then and in that case, this lease shall be void, at the lessors' option, and the lessors may thereupon, without further demand or notice, enter upon said premises, and take possession thereof, and of all improvements thereon, forcibly if necessary, without being guilty of trespass * * *."

A court of equity has power, under certain circumstances, to relieve a tenant from forfeiture of his estate because of a failure to pay the rent reserved at the time required by the terms of his lease. Bonfils v. Ledoux, 8 Cir., 266 F. 507; Sheets v. Selden, 7 Wall., 416, 74 U.S. 416, 19 L.Ed. 166; Kann v. King, 204 U.S. 43, 27 S.Ct. 213, 51 L.Ed. 360. This rule is bottomed on the general principle that the rent is the object of the parties, and the right of forfeiture only an incident intended to secure its payment, and, the measure of damages being fixed and certain, when the principal and interest are paid the compensation is complete. The doctrine, however, is not to be extended to the point of injustice or inequity. The power of a court of equity is properly exercised in such cases to relieve from the consequences of a past default which may be adequately compensated for in damages, but it can not properly be extended to the re-writing or execution of a new contract controlling the parties in the future. In this case, the court, confronted with a perplexing situation, sought to do equity between the parties, but in doing so has in effect written a new contract by which to determine the rights of the parties during a period of more than fifty years to come. This, we think, the court was without power to do. A court of equity will not interfere to prevent the enforcement of the express terms of a written contract, even though by virtue of circumstances such enforcement may work a hardship upon one of the contracting parties. Coffin v. Younker, 196 Iowa 1021, 195 N.W. 591.

In the case of Empress Theatre Co. v. Horton, 8 Cir., 266 F. 657, in an opinion by the late Walter H. Sanborn, it is said (page 664):

"That, while relief against forfeitures may be granted where, as in failures to pay on time fixed money rents or installments of the purchase price of lands, damages from the breach are certain, and adequate compensation may be made, such relief is never granted where the damages from the breach because of which the forfeiture is incurred cannot be ascertained with reasonable certainty ([Brewster v. Lanyon Zino Co.], 140 F. [801], 816, 72 C.C.A. 213). * * * That there is no insuperable objection to the enforcement of a forfeiture by a court of equity, and, when that is more consonant with the principles of right, justice, and morality than to withhold relief, or when there is full, clear, and strict proof of a legal right to a forfeiture, equity follows the law and enforces it (140 F. [801], 819, 820, 72 C.C.A. 213)."

In the instant case, the lower court went beyond relieving from the consequences of a past default, but relieved the parties from the terms of the contract in the future by writing a contract to which neither of the parties had ever subscribed. As said by the court in Cummings v. Clark, D.C., 282 F. 300, 303, "The stop is always made short of the writing of a new contract for the parties."

We put aside as requiring no discussion the contention that the lessors, by accepting checks or drafts from the lessees in payment of the rent when gold and currency were equal in value, indicated an intention to waive in the future the

provisions of the lease, or that they could be estopped from demanding gold.

While plaintiffs are not entitled to the relief demanded in their bill of complaint, still the admissions in the pleadings and the undisputed evidence disclose some equities in their favor, which a court of equity must recognize. They and their predecessors in interest have expended very substantial sums of money in improving the leased premises and constructing permanent buildings thereon. This was done in good faith pursuant to a contract between the parties then confessedly valid and enforceable. The fact that the contract has since become unenforceable is not due to any avoidable default on the part of plaintiffs or their predecessors. It would, therefore, be inequitable to take from them the benefit of the investment so made in the buildings, improvements and betterments on this leased property and give that benefit to the defendant lessors. Plaintiffs, under their contract which has become unenforceable, were entitled to the occupancy and use not only of the land but of the buildings, improvements and betterments placed thereon for and during the term of the lease, which still has approximately fifty years to run. It is is not until the termination of the lease that the title to such structures is vested in the lessors. They are of a permanent character and can not advantageously be removed from the land.

Defendants, in their cross-complaint, are seeking the aid of a court of equity, and hence, they must be required to do equity. Larson v. First State Bank, 8 Cir., 21 F.2d 936; Myers v. Hurley Motor Company, 273 U.S. 18, 47 S.Ct. 277, 71 L.Ed. 515, 50 A.L.R. 1181; Stark v. Cooper, 203 Mo.App. 238, 217 S.W. 104; Dalpine v. Lume, 145 Mo. App. 549, 122 S.W. 776; Bliley v. Wheeler, 5 Colo.App. 287, 38 P. 603. This court, speaking through the late Judge Sanborn, in Larson v. First State Bank, supra, in applying this equitable principle, among other things said (page 938):

"Established principles and rules of practice in equity are that he who seeks equity may be required to do equity, and that a chancellor or a court of equity may condition the grant of equitable relief to the complainant or the moving party with the enforcement of a defendant's opposing equities, although those equities are barred by limitation to such an extent that they may not be enforced by an original suit or proceeding by the latter."

In Myers v. Hurley Motor Company, supra, the Supreme Court considered the rights of a party seeking to avoid a contract entered into by him while he was an infant. In the course of the opinion it is said (page 278):

"It has been held that, where an infant, after coming of age, seeks the aid of a court of equity to avoid a contract, under which he has received property, and restore to him the possession of obligations with which he has parted, he will be required, wholly irrespective of his own good faith in the transaction, to do equity, which may extend to compelling him to make full satisfaction for the deterioration of the property due to his use or abuse of it. * * *

"Our conclusion that the affirmative defense is available in this action does not rest upon the doctrine of estoppel, though the result may be the same. It recognizes the plaintiff's right to repudiate his promise and sue for the return of his payments, and his immunity from a plea of estoppel in so doing. Its effect is not to enforce the disaffirmed contract directly or indirectly, but to allow him to invoke the aid of the court to enforce an equitable remedy arising from the disaffirmance only upon condition that, 'seeking equity, he must do equity.' And the application of the maxim is not precluded because defendant's claim might not be enforceable in any other manner."

This issue was not passed upon by the lower court because the court denied the right of forfeiture. It was in fact not presented by plaintiffs because they were insisting on the validity of their contract. While the defendants are entitled to a decree forfeiting the lease, in the circumstances here disclosed they are not entitled to benefit by such forfeiture, nor, on the other hand, are the plaintiffs entitled to profit thereby. Plaintiffs should not be required to lose the benefit of the use of the improvements which they have constructed and which, under the lease, they are entitled to for a period of approximately fifty years. The matter not having been presented to the lower court, it would be improper for us to direct the court as to the particular form of decree which should be entered so as to protect and do complete justice to all of the parties, because the parties are entitled to be heard upon that issue. The parties should be permitted to amend their pleadings, as they may be advised, so as properly to present this issue.

The decree appealed from is therefore reversed and the cause remanded for further proceedings consistent with this opinion.

WOODROUGH, Circuit Judge (dissenting).

The dispute between the landlord and tenant in this case involves the application of the gold clause resolution of June 5, 1933, to their lease. The lease was made in 1890 to run ninety-nine years and calls for rent to be discharged by quarterly deliveries of 139,320 grains of pure unalloyed gold. No question arises about the constitutional power of congress over such a gold clause in a lease contract. The court of last resort has settled that congress had full power to make the rent payable in legal tender. But the landlord claims that the Congress did not word the joint resolution[2] so as to reach the gold clause in this lease and make it payable in legal tender. It claims that notwithstanding the joint resolution its right to demand gold continued intact until gold payments became impossible in January of the next year, and thereupon the landlord became entitled to evict the tenant. The tenant insists the joint resolution gave it the right to pay the rent in legal tender for the years of the lease remaining after June 5, 1933.

The occasion for the passage of the joint resolution was the emergency then existing and the apprehension that contracts for payment in gold or in amounts of money measured by gold aggregating many billions of dollars which were outstanding in the United States were being called or would be called by the creditors holding the same, that there was a flight of gold into hiding and export and that gold was or would be so unobtainable that the debtors would be ruined. The resolution recited that the provisions of such obligations obstructed the power of Congress to regulate the value of the money of the United States, and declared that every provision made with respect to any obligation which purports to give the obligee a right to require payment in gold, or in an amount of money of the United States measured thereby, is against public policy and it prohibited such contract provisions entirely for the future.

The main object of the resolution, however, was to meet the emergency caused by the existence of the vast amount of gold obligations already outstanding and to make them payable in legal tender. The most vital part of the resolution is the declaration of the legislative will that every obligation, whether there is a gold clause in it or not, shall be discharged upon payment dollar for dollar in any coin or currency which at the time of payment is legal tender for public and private debts.

The expression "every obligation" in this clause (a) of the resolution is so broad that standing alone it would cover all obligations to deliver commodities of any and every kind and it would make them all dischargeable with legal tender. But such commodity obligations were not within the purview of the resolution. It was not declared in the resolution that obligations to deliver gold as a commodity for use in the arts or sciences or the like obstructed the power of Congress or contravened public policy and there was no purpose of the resolution to affect contracts to deliver gold for such purposes. Accordingly, Congress limited "every obligation" as follows: "(b) As used in this resolution [section] the term 'obligation' means an obligation * * * payable in money of the United States." On reading

2 "Provision for payment of obligations in gold prohibited; uniformity in value of coins and currencies.

"(a) Every provision contained in or made with respect to any obligation which purports to give the obligee a right to require payment in gold or a particular kind of coin or currency, or in an amount in money of the United States measured thereby, is declared to be against public policy; and no such provision shall be contained in or made with respect to any obligation hereafter incurred. Every obligation, heretofore or hereafter incurred, whether or not any such provision is contained therein or made with respect thereto, shall be discharged upon payment, dollar for dollar, in any coin or currency which at the time of payment is legal tender for public and private debts. Any such provision contained in any law authorizing obligations to be issued by or under authority of the United States, is hereby repealed, but the repeal of any such provision shall not invalidate any other provision or authority contained in such law.

"(b) As used in this section, the term 'obligation' means an obligation (including every obligation of and to the United States, excepting currency) payable in money of the United States; and the term 'coin or currency' means coin or currency of the United States, including Federal Reserve notes and circulating notes of Federal Reserve banks and national banking associations. (June 5, 1933, c. 48, § 1, 48 Stat. 113)" 31 U.S.C.A. § 463.

the main legislating clause of the resolution with this definition of "obligation" incorporated in it, the intent is clear that every obligation payable in money of the United States, whether or not it contains a provision which purports to give the obligee a right to require payment in gold, or in any amount of money measured thereby, or in a particular kind of currency, shall be discharged in legal tender.

This limiting definition was appropriate to exclude from the scope of the resolution entirely all obligations to deliver commodities generally or to deliver gold for commodity use, such as in the arts and sciences, because no such obligations are payable in money. But the vast aggregated billions of gold bond obligations in the United States for principal and for interest and of long time gold building and railroad lease indentures have generally been paid in money. The gold clauses have served only as stated in the resolution to measure the amount of money called for. They are capable of being paid in money. They are expected to be paid in money. There was never enough gold in the world to pay but a small fraction of them. They are payable in money because the dictionary and commonly accepted meaning of the word "payable" is, "that can be paid," "that is to be paid," "capable of being paid."

If, therefore, regard is had to the joint resolution as a whole, the intention of Congress clearly appears to require every creditor to accept legal tender in discharge of every obligation excepting only such obligations as call for commodities or for gold as a commodity, distinguished from gold to pay rent or to pay principal and interest of bonds and the like payments in which the commodities of commerce are not used and have no place.

In the first part of the resolution, Congress specifies the gold obligations that obstruct its powers and contravene public policy. Second, it declares the legislative will that every obligation whether it contains such gold clauses as specified or not, shall be discharged in legal tender. And third, it eliminates by definition the commodity transactions of commerce and the arts and sciences. But it leaves subject to the resolution all of those obligations that obstruct and offend public policy, all of those which contain an obligation to pay gold and which contemplate that the gold shall merely measure the amount of money.

The particular lease in this case comes squarely under the definition of the resolution and is plainly an obligation payable in money within its intendment. The rent has been paid in money of the United States for nearly half a century and no intent to have it paid in any other way can be dug out of the lease instrument without perverting its language. The pure unalloyed gold called for does not exist in actuality. It could not be identified if it did exist. It is used in the lease solely to measure the amount of money payable under the lease. It has always been so used and it can not be used any other way. The number of grains of pure unalloyed gold specified in the lease corresponded exactly with the imaginary pure unalloyed gold in the United States dollar. (That coin was never pure or unalloyed gold.) But the measurement was accurate and the landlord was content. It is not to be imagined that the landlord exercised its option to take six thousand dollars quarterly out of its grace. It took them because they equaled the number of dollars it was entitled to get according to the pure unalloyed gold measuring stick used in the lease.

The obligation of this lease was also payable in money of the United States because gold dollars were part of that money after as well as before the resolution. If the tenant tendered gold dollars enough with all their alloy to make up the specified grains of pure unalloyed gold, on what ground could the landlord have refused to take them? None can be imagined The landlord had to take them. How, then, can it be said that the obligation is not payable in that way? It is payable in money of the United States within the intendment of the resolution.

The legislative will is that it shall be discharged upon payment dollar for dollar in legal tender.

Turning now to the landlord's demand for gold. The landlord offers no light on the legislative intent of the Congress declared in the gold resolution or upon the intent of the parties to the lease contract. No possible reason is suggested why Congress should have singled out some particular kind of gold clause obligations like those heretofore considered by the Supreme Court and make them payable in legal tender and at the same time leave out the kind of gold obligations found in this lease. If one kind obstructs the pow-

er of Congress and offends public policy, so does the other, and to the same extent, and there is no evidence that one kind has been used any oftener than the other.

There is a contention that the "139,320 grains of pure unalloyed gold" called for in the lease is not a measure of money but means gold bullion; that it means a commodity and an article of commerce. But I find nothing to support the contention. No witness is heard to say he ever knew of any pure unalloyed gold in commerce or anywhere else. It is also urged that there is difficulty in ascertaining the dollar for dollar measure for the rental required by the resolution, but I see none. There has been none for the past half century and there will be none in the next. There were so many grains of imaginary pure unalloyed gold in the United States (alloyed) gold dollar at the time of the resolution and there was no uncertainty how many dollars rent the tenant had to pay. It must pay the same number now and for the rest of the lease period.

The wedge of the landlord's attack on the resolution is in the word "payable" found in the definition clause (b). The landlord would have that read as though "payable" meant "in terms specifying as the only medium of payment." Then the resolution requiring discharge of every obligation in legal tender could be confined to obligations which in terms specified United States money as the only medium of payment and the intent of Congress to meet the menace of gold obligations with legal tender payments could be defeated. Such is practically the meaning ascribed to "payable" in the majority opinion on which its decision turns.

Undoubtedly payable may be used to convey that meaning. But the word "payable" is not limited to such a meaning either in common understanding or as defined in dictionaries, and obviously it cannot be intended to have that meaning in the joint resolution. To give it such meaning would make the main legislative clause of the resolution read: Every obligation in terms specifying money of the United States as the only medium of payment whether it contains a provision purporting to give the obligee a right to require payment in gold or not shall be discharged in legal tender. That does not make sense. But it demonstrates that Congress intended no such

meaning to be given to the word "payable." The majority decision is in substance that the resolution does not make sense.

If the word "payable" is not misconstrued, but if it is given its natural meaning; if "payable in money" is construed may be paid in money, then the intent of the joint resolution to make the rent under the lease contract here payable in legal tender is clear. The function of the court and its only function here is to enforce that intent. It ought to compel the landlord to take its rent in legal tender, dollar for dollar with the number of dollars it was entitled to get and was getting before the resolution.

I suppose that if the court should hold that the rent in this case was not payable in money, and if it holds that the landlord still had the right to require pure unalloyed gold to be delivered to it after the joint resolution, then eviction of the tenant may follow. The good will of the establishment built up in the location over half a century may be destroyed. The employees discharged. The landlord inducted into the buildings the tenant erected, and perhaps so as to thousands of other landlords and holders of gold obligations. They are not going to equity.

But I venture that our history can present no such use of judicial power to turn the aim of Congress from the object to which it was directed. Granting that Congress might have worded its gold resolution more skillfully. Concede that the court must construe the words to bring out the sense. We know as well as the man on the street that the aim of it was to save tenants (like other debtors) from obligation to pay the landlords' rent in gold or in an amount of money measured by gold. To let them pay legal tender. Congress outlawed gold. What member would vote for a law to put the tenant on the street and the landlord in the buildings which the tenant has put up? The courts have that power. They may turn destruction upon debtors and forfeit vast properties to landlords and lien holders. But they must find their justification at the bar of opinion by pointing out words of Congress that manifest such an intent with positive certainty. I think the words of Congress refute any such intent.

The court should reverse the decree and order the landlord to accept its rent in legal tender. I also think the decision

in this case is directly contradictory to the opinion of this court in Guaranty Trust Co. v. Berryman Henwood, Trustee, 98 F.2d 160, just handed down.