## SUSPINE et al. v. COMPANIA TRANSATLANTICA CENTROAMERICANA, S. A., et al.

District Court, S. D. New York.

Feb. 13, 1941.

Herbert J. De Varco, of New York City, for libelants.

Hunt, Hill & Betts, of New York City (John W. Crandall, of New York City, of counsel), for respondent Arnold Bernstein Shipping Co. Inc.

Adolph Finkelstein, of New York City (Sydney Saxon, of New York City, of counsel), for respondent Compania Transatlantica Centroamericana, S. A.

John T. Cahill, U. S. Atty., of New York City (William F. Young, of New York City, of counsel), for intervenor.

HULBERT, District Judge.

This suit in Admiralty came before me on motion to argue the sufficiency of the exceptions and exceptive allegations to the libel. Suspine v. Compania, etc., Dec. 6, 1940, 37 F.Supp. 263. Following the rendition of that opinion, the libelants served and filed a responsive pleading in which they traversed the exceptive allegations. Meanwhile the United States Attorney intervened on behalf of the Government and a hearing of the issue was set and promptly held.

When the case then came on, proctor for the libelants withdrew his objections to the certificate of the United States Collector of the Port of Baltimore, pleaded by the respondents in their exceptive allegations as a justification for the discharge of the libelants, and stated that he did not desire to offer any proof in support of libelants' claim that the sinking of the vessel, as alleged in the libel, was the reason for their discharge.

Accordingly I make the following:

Findings of Fact:

1. On or about the 5th day of May, 1940, libelants signed regular shipping articles at the office of the Consul of the Republic of Panama stationed at the port of Newport News, in the State of Virginia, in the capacity set opposite their respective names in the articles, to enter the service of the S/S Panamanian for a voyage from Newport News to ports in England, for a period not to exceed six months, at stipulated wages and found.

2. The respondent, Compania Transatlantica Centroamericana, S. A., is a corporation organized under and by virtue of the laws of the Republic of Panama and has an office for the regular transaction of business within the Southern District of New York.

3. The respondent Arnold Bernstein Shipping Company, Inc., is a corporation organized under and by virtue of the laws of the State of New York and has an office for the regular transaction of business within the Southern District of New York.

4. The respondent, Compania Transatlantica Centroamericana, S. A., owned the S/S Panamanian which was registered under the laws, and sailed under the flag, of the Republic of Panama, and the Arnold Bernstein Shipping Company, Inc., was, by agreement with said owner, engaged in the operation and management of said vessel.

5. Section 1206 of Chapter 6 of the Code of Commerce of the Republic of Panama provides as follows: "Should the voyage agreed upon fail to take place, due to the action of the owners, of the master, or of the charterers, the seamen may retain by way of indemnity the advance made to them on account of their wages, or they may claim, if they prefer to do so, one month's wages."

6. Section 1207 of Chapter 6 of the Code of Commerce of the Republic of Panama provides: "If the voyage is discontinued after the vessel has sailed from the port, they shall receive their full salaries such as would have accrued to them if the voyage had been completed. If the agreement has been made by the month, there shall be taken as a basis, the estimated duration of the voyage. They likewise, shall be entitled to claim transportation to the place where voyage ought to have come to an

end, or to the place of sailing in their discretion."

7. Section 1208 of Chapter 6 of the Code of Commerce of the Republic of Panama provides:

"If the voyage is countermanded before sailing, due to a contingency beyond the control of the parties, the seamen shall be entitled only to such wages as may have become due or to the advances received, to the exclusion of any further indemnity. The following events shall be held to be contingencies beyond control of the parties:

"(a) Declaration of war or an embargo placed on the trade with the country of destination of the voyage.

"(b) Blockade of port of destination or breaking out of pestilence at said port.

"(c) Embargo placed at said port on merchandise carried by vessel.

"(d) Detention or attachment of vessel, if bond is not allowed.

"(e) Any disaster overtaking vessel rendering her absolutely unseaworthy."

8. Section 1225 of Chapter 6 of the Code of Commerce of the Republic of Panama provides: "The member of the crew who proves he has been dismissed without proper ground, after commencement of the voyage, shall be entitled, by way of indemnity, to the full wages and to payment of expenses for return to port of embarkation. This indemnity is reduced to one-third of wages if dismissed before commencement of voyage."

9. The libelants are citizens of the Philippine Islands.

10. On August 28, 1940, the United States Collector of the Port at Baltimore, Maryland, issued the following certificate:

"Treasury Department
"United States Customs Service
"Baltimore, Md.
"August 28, 1940.

"To Whom It May Concern:

"This is to certify that on June 29, 1940, the Master of the Panamanian S/S Panamanian applied to this office for clearance of the vessel to Liverpool, England, and clearance was refused because of the presence on board of Philipino seamen, who were prohibited from making such a voyage by the Neutrality Act of 1939, and by the Regulations of the Department of Commerce.

"It is further certified that clearance was granted to the vessel on July 3, 1940, when this office was satisfied that there were no persons on board who were prohibited by the Neutrality Act of 1939 from making the voyage in question."

11. On or about July 5, 1940, the libelants were discharged by the respondents as members of the crew of the S/S Panamanian and evicted from said vessel. They claim damages from the date of discharge to the end of the voyage, November 5, 1940, in the amount of $15,840, for their daily subsistence and maintenance for such period in the amount of $18,828, and for alleged overtime wages of certain libelants at 70 cents per hour, and for double time on Sunday, amounting to $1,227.80.

The Act of Congress passed November 4, 1939, Title 22 U.S.C.A. §§ 245j to 245j—19, is known as the Neutrality Act of 1939.

The respondents contend:

1. That the libelants are "citizens" within said act;

2. As such, are debarred from entering the combat area defined by the President of the United States pursuant thereto, and

3. Such contract for the employment of the libelants upon the S/S Panamanian violated the laws of the United States and hence is null and void and unenforceable.

On November 4, 1939, the President of the United States pursuant to Section 1(a) of the said Neutrality Act, by proclamation No. 2374, 4 Federal Register 4493 D.I.–B.V., proclaimed that a state of war existed between Germany and France; Poland; and the United Kingdom, India, Australia, Canada, New Zealand, and the Union of South Africa.

Section 3 of the Neutrality Act provides that whenever the President shall have issued a proclamation under the authority of the Neutrality Act, and he shall thereafter find that the protection of citizens of the United States so requires, he shall, by proclamation, define combat areas, and thereafter it shall be unlawful, except under such rules and regulations as may be prescribed, for any citizen of the United States or any American vessel to proceed into or through any such combat area.

That on November 4, 1939, the President of the United States, acting under the authority of the said Neutrality Act, issued a proclamation, No. 2376, 4 Federal Register 4495–B.V., defining combat areas, and included in the combat areas so defined were all the waters adjacent to the British Isles.

Section 16 of the Neutrality Act, under the heading of "Definitions", provides:

"(a) The term 'United States', when used in a geographical sense, includes the several States and Territories, the insular possessions of the United States (including the Philippine Islands), the Canal Zone, and the District of Columbia. * * *

"(f) The term 'citizen' shall include any individual owing allegiance to the United States * * *".

The Philippine Independence Act, Title 48 U.S.C.A. § 1231 et seq., approved March 24, 1934, authorized the Philippine Legislature to formulate and draft a constitution for the government of the commonwealth of the Philippine Islands, and Section 1232 provides that such constitution shall contain the mandatory provision, among others, that pending the final and complete withdrawal of the sovereignty of the United States over the Philippine Islands, "All citizens of the Philippine Islands shall owe allegiance to the United States." Subdivision (2) thereof reads: "Every officer of the government of the Commonwealth of the Philippine Islands shall, before entering upon the discharge of his duties, take and subscribe an oath of office, declaring, among other things, that he recognizes and accepts the supreme authority of and will maintain true faith and allegiance to the United States."

The Constitution of the Philippine Islands, adopted February 8, 1935, and approved by the President of the United States March 23, 1935, provides in an Ordinance annexed thereto, as follows:

"Section 1. Notwithstanding the provisions of the foregoing Constitution, pending the final and complete withdrawal of the sovereignty of the United States over the Philippines—

"(1) all citizens of the Philippines shall owe allegiance to the United States." 30 Philippine Pub. Laws, p. 386.

The status of the Philippine Islands and their inhabitants was reviewed at length in a very interesting opinion by Mr. Justice Sutherland (who had had an illustrous career in the U. S. Senate before his appointment to the bench) in Cincinnati Soap Co. v. United States, 301 U.S. 308, 57 S.Ct. 764, 81 L.Ed. 1122.

There is in process, under strict control and guidance of the United States, the creation of a sovereign state in the Philippine Islands to be ultimately independent but "still subject in some respects, such, for example, as foreign relations, to the United States." Woolsey, J., in Bradford v. Chase National Bank, D.C., 1939, 24 F.Supp. 28, 37.

The Neutrality Act of 1939 is a part of a comprehensive policy of the United States to preserve its neutrality in wars between foreign states and avoid involvement therein, and designs a plan in the regulation of our foreign commerce to carry out the foreign policy of the United States.

The constitutionality of the Neutrality Act of 1939 is challenged by the libelants in that:

(a) Congress lacked the power to formulate a statutory definition of "citizen" so as to include a citizen of the Philippine Islands as "any individual owing allegiance to the United States."

(b) Such definition is contrary to public policy as expressed in other legislation. And

(c) As so construed deprives them of property and discriminates against them.

■ It cannot be gainsaid that Filipinos are within the statutory definition of "individuals owing allegiance to the United States."

The libelants argue that since they do not have all the attributes of citizenship, the Neutrality Act cannot create by legislative fiat a class of citizens theretofore non-existent.

In its method of statute writing variously defining the status of Alaska, the Canal Zone, the District of Columbia, Guam, the Philippine Islands, Puerto Rico and the Virgin Islands, it might as well be argued that any such legislation constitutes an attempt to devise a new method of granting statehood.

■ It is a fundamental principle that a statutory definition of a word or phrase will be followed by the courts regardless of what meanings may be attributed to it by other authorities, or even by common understanding. Fox v. Standard Oil Co., 294 U.S. 87, 55 S.Ct. 333, 79 L.Ed. 780; Von Weise v. Com'r, 8 Cir., 69 F.2d 439, 441, certiorari denied 292 U.S. 655, 54 S.Ct. 866, 78 L.Ed. 1504; Emery Bird Thayer Dry Goods Co. v. Williams, 8 Cir., 98 F. 2d 166, 170; Schweizer v. Mager, D.C. Ill.1924, 297 F. 334; Cothran & Connally v. United States, D.C.Va.1921, 276 F. 48;

and see Estate of Sanford v. Com'r, 1939, 308 U.S. 39, 60 S.Ct. 51, 84 L.Ed. 20; Candado Stevedoring Corporation v. Locke, D.C.E.D.N.Y., 1932, 1 F.Supp. 456.

■ There is no merit in the contention that the inclusion of Filipinos within the definition of "citizenship" is against public policy because the conduct of foreign relations is committed by the Constitution to the executive and legislative branches of the government, and the propriety of what is done is not a subject for judicial inquiry, and the action of Congress in defining Filipinos as aliens for other purposes, such for example, as barring them from service as seamen upon vessels of American registry, and in other statutes dealing with other subjects, can have no effect upon the constitutionality of the Neutrality Act of 1939 which may be upheld as a valid exercise of the power of Congress over foreign commerce and as a valid exercise of the sovereign power over foreign affairs. United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 57 S.Ct. 216, 81 L.Ed. 255; Cincinnati Soap Co. v. United States, supra.

Section 3 (b) imposes heavy penalties on ship-owners, the officers of vessels, and citizens traveling as passengers, for a violation of the Neutrality Act. Seamen fall within the general penalty provision of Section 15.

Previous to the execution of the ship's articles, clearance had been given at other ports in the United States to vessels of foreign registry whose masters had signed on Filipino cititzens as members of the crew, so that the element of bad faith is not in issue here.

There is no doubt, however, that the Collector of the Port of Baltimore was not only justified but required by the statute to refuse clearance to the S/S Panamanian.

Whether the contract of employment in this case was malum in se or malum prohibitum it is enough that it required the performance of an act prohibited by statute, to make it null and void and unenforceable.

In Bartlett v. Vinor, Carth. 251, 252; 90 Eng.Rep. 750, Lord Holt stated: "Every contract made for or about any matter or thing which is prohibited and made unlawful by any statute, is a void contract, tho' the statute itself doth not mention that it shall be so, but only inflicts a penalty on the offender, because a penalty implies a prohibition, tho' there are no prohibitory words in the statute."

This rule was followed in Central R. of New Jersey v. United States Pipe Line Co., 3 Cir., 1 F.2d 866.

In Brandenburg et al. v. Miley Petroleum Exploration Co., D.C.N.D.Cal., 16 F.2d 933, plaintiffs sued for breach of a contract against the defendants, pursuant to which plaintiffs undertook to sell shares of the defendant's capital stock for a certain fixed compensation, but failed, prior to the execution of the contract, to secure a license to sell stock as required by the law of California. In sustaining demurrers, the Court said, 16 F.2d at page 933: "Whenever a statute is made for the protection of the public, a contract in violation of its provisions is void. It has been uniformly held in California that statutes requiring a license for those practicing certain businesses which fix a penalty for doing business without securing such license are statutes made for the protection of the public. Contracts made by unlicensed persons, performance of which requires them to do the acts for which they should have been licensed, are void."

Under the statute in question, permission may be, and has been given, for sufficient reasons established, to enter the combat area defined in the President's proclamation and no person having the status of a citizen, within the meaning of the Act, may do so otherwise.

■ Moreover, the very purpose of the law in the case at bar is to preserve the neutrality of the United States and avert the risks which brought us into the World War on April 6, 1917.

■ The libelants, however, contend that because the ship's articles were signed at the office of the Panama Consul, the contract is extraterritorial and to be governed by the laws of the Republic of Panama.

There is no merit in this contention. The contract for employment is void under the laws of Panama. Anglo-Continentale Treuhand v. St. Louis Southwestern R. Co., 2 Cir., 81 F.2d 11, 105 A.L.R. 636 (certiorari denied Henwood v. Anglo-Continentale Treuhand, 298 U.S. 655, 56 S.Ct. 675, 80 L. Ed. 1381). Learned Hand, C.J., wrote at page 12, of 81 F.2d, 105 A.L.R. 636: "by the law of most civilized countries the legality of the performance of a contract depends upon the law of the place of performance."

In Central Hanover Bank & Trust Co. v. Siemens & Halske Aktiengesellschaft 15

F.Supp. 927, at page 929, affirmed, 2 Cir., 84 F.2d 993, the court said: "it is the law of the place of performance that controls matters relative to legality of performance."

In Davis v. Jointless Fire Brick Co., 9 Cir., 300 F. 1, at page 4, it was said: "that no state is bound to recognize or enforce contracts which the government of such state may deem injurious to its own interests, or to the welfare of its own people, or which are in violation of its own laws. Such contracts are considered as nullities in every country affected by such considerations, although they may be valid by the laws of the place where the contract is made."

Wharton, The Conflict of Laws, 3d Ed., vol. 2, § 496, states: "That contracts to do acts calculated to imperil national neutrality * * * are void."

My conclusion of law is:

For failure to state a cause of action, the libel must be dismissed and a decree entered in favor of the respondents.